UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

GREGOR LESNIK, et al.,

             Plaintiffs,

     v.

EISENMANN SE, et al.,

             Defendants.

Case No. 16-CV-01120-LHK

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

Re: Dkt. No. 300

       Plaintiffs Gregor Lesnik and Stjepan Papes (collectively, "Plaintiffs") have brought suit stemming from their time working at a facility owned by Tesla, Inc. ("Tesla") in Fremont, California, against 36 different Defendants. Before the Court is an omnibus motion to dismiss filed by Defendants Eisenmann Corporation ("Eisenmann"), Tesla, Mercedes-Benz U.S. International, Inc. ("Mercedes-Benz"), Deere & Company ("Deere"), REHAU Inc. ("REHAU"), LaX Fabricating Ltd. ("LaX"), Volkswagen Group of America Chattanooga Operations, LLC ("VW"), Dicastal North America, Inc. ("Dicastal"), Volvo Car Corp. and Volvo Car US Operations Inc. ("Volvo"), and BMW Manufacturing Co., LLC ("BMW"). ECF No. 300 ("Mot."). However, after the omnibus motion to dismiss was filed, Plaintiffs voluntarily dismissd with prejudice all claims against Mercedes-Benz, Deere, REHAU, LaX, VW, Discatal, Volvo, and

BMW. ECF Nos. 315-22. Thus, the only remaining Defendants who filed the omnibus motion to dismiss are Eisenmann and Tesla ("Moving Defendants"). Having considered the parties' submissions, the relevant law, and the record in this case, the Court GRANTS in part and DENIES in part Moving Defendants' motion to dismiss.

## I. BACKGROUND

### A. Factual Background

Defendant Eisenmann is a manufacturer of specialized paint shop equipment. *See* ECF No. 269 (third amended complaint, or "TAC") at ¶ 213(g); ECF No. 219 at 4. Eisenmann had relationships with a number of manufacturing entities, such as Tesla, to perform construction work related to Eisenmann's equipment. TAC at ¶ 70. The TAC then alleges that Eisenmann, to fulfill these agreements, would hire an array of subcontractors who would then provide the laborers necessary to complete the equipment installation. TAC at ¶ 84, 107. Although the TAC names a number of these subcontractors as Defendants, the one that matters for present purposes is Defendant "Vuzem.[1]"

Although all of the work described in the TAC occurred in the United States, Vuzem did not use American workers. Instead, the TAC alleges that Vuzem and the other subcontractor Defendants hired workers internationally. For example, to help install a paint shop at a Tesla facility in Fremont, California, Vuzem hired Plaintiff Gregor Lesnik, a resident of Slovenia, and Plaintiff Stjepan Papes, a resident of Croatia. *Id.* at ¶¶ 1-2, 60, 111, 213. Lesnik and Papes (like other workers) were brought to the United States on B-1 visas that are generally reserved for skilled work, even though Vuzem, Eisenmann, and Tesla allegedly knew the workers would actually be performing unskilled construction work. *Id.* at ¶¶ 87-95, 115, 145, 211. Eisenmann even allegedly submitted letters to the United States Consulate containing allegedly false statements to obtain B-1 visas on Lesnik and Papes' behalf. *Id.* at ¶¶ 140, 211, 213, 217. The TAC

---

[1] To be precise, the TAC names ISM Vuzem d.o.o., ISM Vuzem USA, Inc., Ivan Vuzem, Robert Vuzem, Vuzem USA, Inc. TAC at ¶¶ 9-13. The Court refers to "Vuzem" for simplicity, and because the TAC alleges that these entities are the same company under different guises. *Id.* at ¶¶ 9-13, 15.

also alleges that Eisenmann supervised Lesnik and Papes' work at the Tesla facility. *Id.* at ¶ 140, 213.

The TAC alleges that the foreign workers, once in the United States, were paid far below minimum wage and were forced to work extreme hours. Lesnik allegedly worked at least 10 and on average 12 hours a day, over 80 hours a week, and received only 1 day in 14 off. *Id.* at ¶ 237. Papes is alleged to have generally "work[ed] the same number of hours for his work at all of the major manufacturing construction sites throughout his time working in the United States." *Id.* Vuzem also allegedly threatened to withhold pay if workers became too sick to work or reported a job injury; threatened to withhold medical benefits if workers reported a job injury; threatened to withhold visas and immigration status; threatened to file a civil suit against Lesnik while he was hospitalized; and even told Lesnik that "this will not go well for you." *Id.* at ¶ 315, 338-39. The TAC also alleges that the foreign workers were subject to poor living conditions in the United States, such as being housed in facilities without kitchens, having multiple workers sleep in the same bedroom, or typically having 6 to 10 workers share a single bathroom. *Id.* at ¶ 318.

**B. Procedural History**

The Court first discusses the instant case, then a previously-filed case by Lesnik against Eisenmann, Tesla, and Vuzem in Alameda County Superior Court, and lastly, a previously-filed workers' compensation action against Vuzem.

**1. The Instant Case**

Plaintiffs filed the complaint initiating this suit on March 7, 2016. ECF No. 1. On July 15, 2016, Plaintiffs filed the first amended complaint. ECF No. 20. On April 25, 2017, the United States filed a notice that it would not intervene in the instant case. ECF No. 25. On April 25, 2017, the Court unsealed the complaint. ECF No. 26.

On August 8, 2017, the Court granted Plaintiffs' motion to file a second amended complaint, and directed the United States to make a "prompt decision" regarding intervention. ECF No. 31. On October 5, 2017, the United States filed another notice that it would not intervene in the instant case. ECF No. 34. On November 11, 2017, Plaintiffs filed the second amended

complaint. ECF No. 37 (second amended complaint, or "SAC").

On July 12, 2018, various moving Defendants—Eisenmann, Tesla, Mercedes-Benz, Deere, REHAU, LaX, VW, Discatal, and BMW—filed a motion to dismiss the SAC. ECF No. 219. On October 1, 2018, the Court granted in part and denied in part the motion to dismiss the SAC. ECF No. 255 ("October 1, 2018 Order"). The Court dismissed Plaintiffs' False Claims Act ("FCA") claim without prejudice for, *inter alia*, failing to satisfy the heightened pleading standards of Federal Rule of Civil Procedure 9(b) as to all moving Defendants except Eisenmann, and failing to identify who was responsible for paying the visa fees for allegedly fraudulently-obtained B-1 visas that formed the basis of the alleged false claim. *Id.* at 14-15. In addition, the Court dismissed Plaintiffs' Fair Labor Standards Act ("FLSA") claim without prejudice because Plaintiffs failed to show that Eisenmann was Plaintiffs' joint employer liable under the FLSA for labor violations while Plaintiffs were employed. *Id.* at 19-20. Furthermore, the Court dismissed Plaintiffs' California Labor Code claims because Plaintiffs failed to identify the statutes and theories under which Plaintiffs were proceeding. *Id.* at 20. Additionally, the Court denied the motion to dismiss Plaintiffs' Trafficking Victims Protection Reauthorization Act ("TVPRA") claim and the California Trafficking Victims Protection Act ("CTVPA") claim as to Tesla and Eisenmann because Plaintiffs alleged enough facts to demonstrate that Tesla and Eisenmann knew or should have known of Vuzem's alleged mistreatment of its workers. *Id.* at 24-25. Lastly, the Court dismissed Plaintiffs' Racketeer Influenced and Corrupt Organizations Act ("RICO") claim without prejudice because Plaintiffs failed to adequately allege the existence of a RICO enterprise and failed to adequately allege a common purpose. *Id.* at 28, 30.

On October 31, 2018, Plaintiffs filed a 108-page third amended complaint. *See generally* TAC. The TAC alleges 13 causes of action (some of which are duplicative), which can be grouped into the following general categories: (1) violations of the FCA (count 1); (2) violations of the FLSA for failure to pay minimum wage and adequate overtime pay (counts 2 and 3); (3) violations of the California Labor Code (counts 4 to 8); (4) violation of the TVPRA (counts 9 and 11); (5) violation of the CTVPA (counts 10 and 12); and (6) violations of RICO (count 13). *Id.* at ¶¶ 125-

4

401.

On November 28, 2018, Defendants Eisenmann, Tesla, Mercedes-Benz, Deere, REHAU, LaX, VW, Dicastal, Volvo, and BMW moved to dismiss the TAC in an omnibus motion to dismiss. *See generally* Mot. On December 17, 2018, Plaintiffs filed 18 dismissal notices, abandoning multiple class action claims and also dismissing with prejudice all of the Defendants that filed the omnibus motion to dismiss the TAC with the exception of Eisenmann and Tesla. ECF Nos. 304-13, 315-22. On December 20, 2018, Plaintiffs filed their opposition. ECF No. 325 ("Opp."). On January 7, 2019, Moving Defendants filed their reply. ECF No. 342 ("Reply"). On February 14, 2019, the United States filed a notice that the United States takes no position on Moving Defendants' motion to dismiss the TAC. ECF No. 349.

### 2. The Alameda County Superior Court Case

On June 5, 2015, Lesnik filed suit in Alameda County Superior Court against, *inter alia*, Eisenmann, Tesla, and Vuzem. ECF No. 130, Dresser Decl. at ¶ 4. Lesnik's Superior Court complaint was amended twice. *Id.* Lesnik's suit stated, *inter alia*, a negligence claim, various wage and hour claims, and an unfair business practices claim against Eisenmann, Tesla, and Vuzem. *Id.* at Ex. C. The factual predicate of Lesnik's Superior Court case all stemmed from generally the same factual predicate as the instant case, including the issuance of visas based on allegedly fraudulent statements and poor working and living conditions. *Id.* Lesnik, in his Superior Court case, also alleged that he was injured from a fall while working at Tesla. *Id.* at ¶ 72. Lesnik eventually agreed to settle the Superior Court action. *Id.*, Dresser Decl. at ¶ 8. A settlement agreement was executed in June 2016. ECF No. 300-3, Ex. A at 8. This settlement agreement was entered into more than a year after Lesnik stopped working at the Tesla facility. TAC at ¶ 136.

The TAC makes no mention of this prior Superior Court case or settlement. However, Moving Defendants seek judicial notice of the settlement agreement despite it not being referenced in the TAC. The Ninth Circuit has held that a district court may consider a document extrinsic to a plaintiff's complaint on a Rule 12 motion if the document is "integral to the plaintiff's claims and its authenticity is not disputed." *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 n.4

(9th Cir. 1998), *superseded by statute on other grounds as stated in Lacey v. Maricopa Cty.*, 693 F.3d 896 (9th Cir. 2012). In considering such a document, the district court need not convert the Rule 12 motion to a motion for summary judgment. *Id.* at 706. The rationale behind this doctrine is simple: a plaintiff's failure to incorporate an extrinsic document "rais[es] the spectre that plaintiff failed to incorporate [the document] by reference in the complaint as a means of avoiding Rule 12(b)(6) dismissal." *Hotel Emps. & Rest. Emps. Local 2 v. Vista Inn Mgmt. Co.*, 393 F. Supp. 2d 972, 979 (N.D. Cal. 2005). Furthermore, "the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated [w]here the plaintiff has actual notice." *Id.* (internal quotations marks and citation omitted).

Here, the Court finds that the settlement agreement is integral to Plaintiffs' claims in the instant case because the settlement agreement settled and released, among other things, "all wage and hour and employment-related claims" against Moving Defendants. ECF No. 300-3, Ex. A at 4. In the instant case, Plaintiffs also assert various state and federal wage and hour and employment-related claims, as well as other claims all stemming from the same factual predicate as the Superior Court case. *See, e.g.*, *Birdsong v. AT & T Corp.*, 2013 WL 1120783, at *2 (N.D. Cal. Mar. 18, 2013) (taking judicial notice of a release not cited in the complaint because "[t]he Release is an integral part of [plaintiff's] allegations"). Thus, the *Hotel Employees* court's enunciation of the principles behind allowing consideration of an extrinsic document on a Rule 12 motion appears correct. Lesnik should not be allowed to avoid potential dismissal of his claims in the instant case via Plaintiffs' strategic decision not to include or mention the settlement agreement that settled substantially similar claims based on substantially similar facts. Moreover, Plaintiffs do not dispute the authenticity of the settlement agreement. *See* Opp. at 31-35. Furthermore, Lesnik cannot argue that he had no notice of the settlement agreement. Lesnik signed the settlement agreement and was even represented by the same counsel representing him in the instant case. Therefore, the Court GRANTS Moving Defendants' request to take judicial notice of the settlement agreement. The Court also takes judicial notice of Lesnik's complaints in the Superior Court to better understand the scope of the Superior Court case, and what claims or

6

United States District Court
Northern District of California

potential claims might be implicated by the settlement agreement.[2] *See* ECF No. 130, Exs. A-C.

### 3. Workers' Compensation Action

On June 2, 2015, Lesnik brought a workers' compensation action against Vuzem before the California Workers' Compensation Appeals Board. ECF No. 130, Ex. D. Lesnik's settlement of the Alameda County Superior Court action also settled his workers' compensation action against Vuzem. ECF No. 300-3, Ex. A at 3.

## II. LEGAL STANDARD

### A. Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). The U.S. Supreme Court has held that Rule 8(a) requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

The Court, however, need not accept as true allegations contradicted by judicially noticeable facts, *see Schwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), and it "may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6)

---

[2] "Undisputed matters of public record" are proper subjects for judicial notice. *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 866 n.1 (9th Cir. 2004). Complaints constitute such undisputed matters of public record. *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1205 n.6 (N.D. Cal. 2014).

Case No. 16-CV-01120-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

motion into a motion for summary judgment, *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995). Nor must the Court "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (internal quotation marks omitted). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

### B. Motion to Dismiss Under Federal Rule of Civil Procedure 9(b)

Claims sounding in fraud are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001). Under the federal rules, a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy this standard, the allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). Thus, claims sounding in fraud must allege "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). In other words, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (citation omitted). The plaintiff must also plead facts explaining why the statement was false when it was made. *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994) (en banc), *superseded by statute on other grounds as stated in Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297 (C.D. Cal. 1996).

"When an entire complaint . . . is grounded in fraud and its allegations fail to satisfy the heightened pleading requirements of Rule 9(b), a district court may dismiss the complaint . . . ." *Vess*, 317 F.3d at 1107 (9th Cir. 2003). The Ninth Circuit has recognized that "it is established law in this and other circuits that such dismissals are appropriate," even though "there is no

Case No. 16-CV-01120-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

explicit basis in the text of the federal rules for the dismissal of a complaint for failure to satisfy 9(b)." *Id.* A motion to dismiss a complaint "under Rule 9(b) for failure to plead with particularity is the functional equivalent of a motion to dismiss under Rule 12(b)(6) for failure to state a claim." *Id.*

### C. Leave to Amend

If the Court determines that a complaint should be dismissed, it must then decide whether to grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (alterations and internal quotation marks omitted). When dismissing a complaint for failure to state a claim, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Id.* at 1130 (internal quotation marks omitted). Accordingly, leave to amend generally shall be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

## III.    DISCUSSION

Plaintiffs' 108-page complaint is lengthy and unclear. *See, e.g.*, TAC at ¶ 177 ("The racketeering activity included a forced labor scheme . . . including as alleged in paragraphs _ to _ herein.") Plaintiffs' counsel did not heed this Court's instruction "to be more concise and clear if [Plaintiffs] opt to amend the [second amended complaint]," which already totaled 62 pages. ECF No. 255 at 6. Plaintiffs' counsel also ignored the Court's comment that the SAC was also at times incomprehensible. *Id.* Instead, Plaintiffs' TAC is almost double the number of pages of Plaintiffs' SAC, and is similarly difficult to parse.

Moreover, 10 Defendants filed the instant omnibus motion to dismiss, and Plaintiffs waited until 3 days before Plaintiffs' opposition was due before Plaintiff dismissed with prejudice 8 of the

United States District Court
Northern District of California

10 defendants who filed the omnibus motion. Thus, Plaintiffs' questionable timing left Moving Defendants no opportunity to brief the actual claims that remain at issue in the instant case until the reply, and required 8 other Defendants to expend significant resources and pages in briefing the motion to dismiss the TAC on claims and parties that are no longer part of the instant case.

Nonetheless, the Court addresses the remaining claims at issue in the instant case. First, Plaintiffs allege that the Moving Defendants violated the False Claims Act ("FCA") with respect to both Plaintiffs Lesnik and Papes. Second, Plaintiffs contend that the Moving Defendants violated various wage and hour laws, including the Fair Labor Standards Act ("FLSA") and numerous portions of the California Labor Code, with respect to Papes only. Third, Plaintiffs claim that the Moving Defendants violated the federal Trafficking Victims Protection Reauthorization Act ("TVPRA") and the California Trafficking Victims Protection Act with respect to both Plaintiffs. Fourth, Plaintiffs argue that Eisenmann violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The Court considers each of the causes of action in turn.

**A. False Claims Act Claim (Count 1)**

Plaintiffs allege that Moving Defendants have violated the False Claims Act ("FCA"). Plaintiffs' FCA theories are a reverse FCA claim under 31 U.S.C. § 3729(a)(1)(G) and a conspiracy to violate the FCA claim under 31 U.S.C. § 3729(a)(1)(C). The crux of Plaintiffs' claims lies in the visas that Plaintiffs were issued in connection with their work in the United States. Plaintiffs allegedly entered the United States on B-1 visas. TAC at ¶¶ 61, 68-69. However, to perform construction work and unskilled labor, Plaintiffs assert the workers should have obtained petition-based visas, such as the "L-1B, H1-B, or the most appropriate H2-B visas." Opp. at 9. Plaintiffs' reverse FCA argument is that "[b]ecause Defendants falsely obtained cheaper [B-1] visas, they avoided an obligation to pay the government the higher fees associated with the more expensive unskilled-worker visa." *Id.*

Moving Defendants advance 3 arguments for why Plaintiffs' FCA claims fail. First, Moving Defendants claim that the TAC fails to allege that any Moving Defendant "either incurred

or avoided any fee associated with a visa application submitted by any Plaintiffs." Mot. at 5. Second, Moving Defendants argue that Plaintiffs' TAC does not meet the heightened pleading standard of Rule 9(b). *Id.* Third, Moving Defendants assert that the TAC fails to allege that any Moving Defendant paid a fee associated with Plaintiffs' B-1 visas. The Court finds Moving Defendants' first argument dispositive of Plaintiffs' FCA claims, and thus does not address the remaining arguments.

### 1. Whether any Moving Defendant Incurred or Avoided a Visa Fee

Moving Defendants argue that Plaintiffs have not stated a reverse FCA violation because Moving Defendants were never under any obligation to pay visa fees associated with the petition-based visas. Plaintiffs claim that Moving Defendants were under an obligation to pay for the more expensive petition-based visas, such as H1-B or H2-B visas, as opposed to the less expensive B-1 visas Plaintiffs obtained to enter the United States.

Since its enactment in 1863, the FCA has been focused on "those who present or directly induce the submission of false or fraudulent claims" to the government. *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1996 (2016). Plaintiffs proceed under the reverse false claims provision, 31 U.S.C. § 3729(a)(1)(G). A reverse FCA claim under § 3729(a)(1)(G) involves "fraudulently reducing the amount owed to the government," which constitutes a false claim. *See Cafasso, United States ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1056 (9th Cir. 2011). § 3729(a)(1)(G) makes liable any person who "knowingly" uses "a false record or statement material to an *obligation* to pay . . . the Government, or knowingly conceals or knowingly and improperly avoids or decreases an *obligation* to pay . . . the Government." *Id.* (emphasis added).

The FCA statute defines "obligation" as "an established duty . . . arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). "The obligation cannot be merely a potential liability . . . ." *United States v. Bourseau*, 531 F.3d 1159, 1169 (9th Cir. 2008) (quoting *Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190

United States District Court
Northern District of California

F.3d 729, 735 (6th Cir. 1999)). "[A]n obligation under the meaning of the False Claims Act[] must be for a fixed sum that is immediately due." *Am. Textile Mfrs.*, 190 F.3d at 735.

Here, there are no allegations that Moving Defendants ever submitted a visa application for the petition-based visas. To the contrary, Plaintiffs' allegations that Moving Defendants *did not* submit a visa application for the petition-based visas form the basis for Plaintiffs' reverse FCA claim. FAC at ¶¶ 61, 68-69. Thus, there was no *obligation* to pay the government for a petition-based visa because no visa application for a petition-based visa was ever actually submitted. Even Plaintiffs concede that "[a]n employer is obligated to pay fees *when applying* for petition based visas." *Id.* at ¶ 209 (emphasis added).

As the Ninth Circuit held in *Bourseau*, "[t]he obligation cannot be merely a *potential* liability." 531 F.3d at 1169 (emphasis added). However, that is exactly what Plaintiffs are predicating their reverse FCA claim on: a *potential* liability incurred only if Moving Defendants had applied for the petition-based visas. Moreover, because no petition-based visa application was made, there was no "fixed sum that [was] immediately due," which is a requirement of an obligation pursuant to *American Textile Manufacturers*. 190 F.3d at 735.

Plaintiffs do not have a response to Moving Defendants' argument. Strangely, Plaintiffs seem to agree with Moving Defendants' argument. Plaintiffs concede: "[v]isa fees are an *obligation* to pay *upon applying for a visa* the approximated cost to the government for visa related expenses." Opp. at 9 (emphasis added).

However, Plaintiffs focus on the fact that they alleged that it was fraudulent for Plaintiffs to have entered the United States on their B-1 visas because Plaintiffs were performing unskilled labor on their B-1 visas, thus Moving Defendants avoided an obligation to pay the government higher visa fees associated with the petition-based visas. *Id.* Plaintiffs' argument misses the mark. As explained above, the obligation to pay the government only arises upon *applying* for a visa. Thus, Plaintiffs' reverse FCA claim under 31 U.S.C. § 3729(a)(1)(G) fails because Plaintiffs have not shown that Moving Defendants applied for a visa that obligated Defendants to pay a higher "fixed sum that is immediately due."

12

United States District Court
Northern District of California

Moreover, because Plaintiffs' reverse FCA claim under § 3729(a)(1)(G) fails as to Moving Defendants, there can be no underlying conspiracy to commit a violation of the FCA claim under § 3729(a)(1)(C). § 3729(a)(1)(C) requires a conspiracy "to commit a violation" of the other subparagraphs constituting a claim under the FCA. Numerous courts have found that an underlying violation of the other subparagraphs constituting a claim under the FCA is required to state a claim for conspiracy to commit a violation of the FCA. *See, e.g.*, *Bishop v. Wells Fargo & Co.*, 823 F.3d 35, 50 (2d Cir. 2016) ("[T]he relators cannot show a conspiracy to commit fraud given that they have not sufficiently pleaded fraud under the FCA"), *vacated on other grounds by* 137 S. Ct. 1067; *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 507 (3d Cir. 2017) ("[T]here can be no liability for conspiracy where there is no underlying violation of the FCA."); *United States ex rel. Godfrey v. KBR, Inc.*, 360 Fed. App'x 407, 413 (4th Cir. 2010) ("Since Godfrey's conspiracy claim is premised on those claims of underlying FCA violations, the conspiracy claim rises and falls with the individual claims"); *United States v. Strock*, 2018 WL 647471, at *12 n.7 (W.D.N.Y. Jan. 31, 2018) ("Plaintiff's FCA conspiracy claim fails for the separate reason that a plaintiff cannot allege a conspiracy to commit an FCA violation when it has failed to allege an underlying violation of the statute."); *United States ex rel. Holbrook v. Brink's Co.*, 336 F. Supp. 3d 860, 873 (S.D. Ohio 2018) ("[T]here can be no liability for conspiracy where there is no underlying violation of the FCA" (quoting *Pencheng Si v. Laogai Res. Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014)); *United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 285 F. Supp. 3d 44, 56 (same); *United States v. Univ. of N. Tex.*, 2016 WL 369693, at *6 (E.D. Tex. Feb. 1, 2016) ("Relator cannot plead a conspiracy claim under the FCA when his allegations fail to demonstrate an underlying violation of the FCA."). Therefore, because Plaintiffs have failed to allege a reverse FCA claim under § 3729(a)(1)(G), Plaintiffs also fail to state a conspiracy claim under § 3729(a)(1)(C). Thus, Moving Defendants' motion to dismiss the FCA claims under §§ 3729(a)(1)(G) and 3729(a)(1)(C) (count 1) is GRANTED.

Because Plaintiffs cannot state a reverse FCA claim based on visas for which they never applied, further amendment would be futile. This is a legal deficiency that cannot be cured by

additional factual pleadings. Because any amendment would be futile, and it would be unduly prejudicial to Moving Defendants to litigate a third motion to dismiss regarding the same deficiencies, leave to amend is DENIED. *Leadsinger, Inc.*, 512 F.3d at 532.

The Court now turns to Papes' federal and state wage and hour claims.

**B.  Wage and Hour Claims (Counts 2 to 8)**

Plaintiff Papes[3] alleges that Moving Defendants violated federal and state wage and hour laws. Specifically, Papes alleges that Moving Defendants violated the federal Fair Labor Standards Act ("FLSA") by failing to pay minimum wage (count 2) and failing to pay overtime wages (count 3). Also, Papes claims that Moving Defendants violated California labor laws by: failing to pay minimum wage (count 4); failing to pay overtime wages (count 5); failing to provide rest periods (count 6); failing to provide accurate wage statements (count 7); and failing to pay waiting time penalties (count 8). The Court first analyzes Papes' FLSA claims, then Papes' California Labor Code claims.

**1.  Fair Labor Standards Act Claims (Counts 2 and 3)**

In its October 1, 2018 Order, the Court granted the motion to dismiss the SAC's Fair Labor Standards Act ("FLSA") claims with leave to amend. ECF No. 255 at 20. Plaintiffs have now filed their *third* amended complaint, reasserting the FLSA claims against Moving Defendants. After reviewing Plaintiffs' TAC, the Court agrees with Moving Defendants that Plaintiffs' fourth attempt at stating a claim fails to address the deficiencies identified by the Court in the October 1, 2018 Order.

In particular, in dismissing Plaintiffs' FLSA claims against Eisenmann in the October 1, 2018 Order, the Court explained that a prerequisite to FLSA liability was being considered an employer, yet "*the only allegations* Plaintiffs identif[ied] . . . in support of joint employer status relate[d] to Eisenmann's control over working conditions." *Id.* (emphasis added). The Court warned that "failure to cure the deficiencies . . . will result in a dismissal with prejudice of the

---

[3] Plaintiff Lesnik does not bring any federal or state wage and hour claims against Moving Defendants. *See* ECF Nos. 305-11.

Case No. 16-CV-01120-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

deficient claims of theories." *Id.* at 32.

Here, Moving Defendants argue that first, Moving Defendants were not Papes' joint employers, and second, Papes' FLSA claims are barred by the statute of limitations. Mot. at 23-25. The Court finds Moving Defendants' first argument dispositive, and does not reach the second argument.

a.   Whether Moving Defendants were Papes' Joint Employers

Moving Defendants argue that they were not Papes' joint employers, so they cannot be liable for any FLSA causes of action. The Court agrees.

The joint employer doctrine recognizes that "even where business entities are separate, if they share control of the terms or conditions of an individual's employment, both companies can qualify as employers." *Johnson v. Serenity Transp., Inc.*, 2016 WL 270952, at *10 (N.D. Cal. Jan. 22, 2016) ("*Serenity I*") (quoting *Guitierrez v. Carter Bros. Sec. Servs., LLC*, 2014 WL 5487793, at *3 (E.D. Cal. Oct. 29, 2014)). At the pleadings stage, although the "plaintiff is not required to conclusively establish that defendants were her joint employers . . . [the plaintiff] must at least allege some facts in support of this legal conclusion." *Id.* (quoting *Hibbs-Rines v. Seagate Techs., LLC, 2009 WL 513496*, at *5 (N.D. Cal. Mar. 2, 2009)).

A defendant must be an "employer" of the plaintiff to be liable under the FLSA. *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983), *abrogated on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985). "Two or more employers may be 'joint employers' for the purposes of the FLSA." *Maddock v. KB Homes, Inc.*, 631 F. Supp. 2d 1226, 1232 (C.D. Cal. 2007). "All joint employers are individually responsible for compliance with the FLSA." *Id.*; *see also* 29 C.F.R. § 791.2(a). Whether an entity is a "joint employer" under the FLSA is a question of law. *Torres-Lopez v. May*, 111 F.3d 633, 638 (9th Cir. 1997).

The Ninth Circuit has adopted a four-part "economic reality" test to determine when the employer-employee relationship exists. *See Bonnette*, 704 F.2d at 1470. These factors include whether the employer: "(1) had the power to hire and fire the employees, (2) supervised and

controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.*; *see also Moreau v. Air France*, 356 F.3d 942, 946-47 (9th Cir. 2004) (confirming the applicability of the *Bonnette* factors for the economic reality test); *Serenity I*, 2016 WL 270952, at *10 (applying *Bonnette* factors). The Court takes each factor in turn, first for Eisenmann, then for Tesla.

i. *Bonnette* Factors as Applied to Eisenmann

The first *Bonnette* factor is whether the alleged joint employer has the power to hire and fire the purported employees. The TAC does not allege that Eisenmann had the power to hire and fire Papes. The most to which Plaintiffs can point in their opposition are allegations that Eisenmann "contracted with other entities such as ISM Vuzem, d.o.o. to hire construction workers including Stjepan Papes." TAC at ¶ 79. As discussed above, the TAC makes clear that "Eisenmann . . . used a series of labor contractor entities, including ISM Vuzem d.o.o. . . . to act as subcontractors and to hire enough foreign workers to do the construction work." *Id.* at ¶ 84. There are no allegations that Eisenmann itself "post[ed] available . . . jobs, review[ed] resumes or applications, or interview[ed] candidates," nor was Eisenmann involved in "drafting, approving, or executing contracts" between Vuzem and the workers, including Papes. *Serenity I*, 2017 WL 1365112, at *6. Without engaging in the aforementioned activities, the *Serenity I* court held that the first *Bonnette* factor weighed against a finding of joint employment status. *Id.* Thus, this *Bonnette* factor weighs against a finding of a joint employer status for Eisenmann.

The second *Bonnette* factor is whether the alleged joint employer had control over the employees' work schedules or conditions. The TAC alleges that "Eisenmann . . . had supervisors that came from time to time to take a look to see how the work performed by . . . Gregor Lesnik [and] Stjepan Papes . . . was progressing and to assess it. Further, Eisenmann . . . through multiple employees and agents provided instructions to . . . Gregor Lesnik and Stjepan Papes." TAC at ¶ 140. TAC at ¶ 140. The Court, as it must, construes the TAC in Plaintiffs' favor. *See Manzarek*, 519 F.3d at 1031 (noting courts accept "factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party"). So construed, the picture that

16

emerges is of Eisenmann using subcontractors like Vuzem to supply laborers which Eisenmann periodically supervised at job sites. Consequently, this *Bonnette* factor weighs in favor of finding that Eisenmann was a joint employer.

The third *Bonnette* factor is whether the alleged joint employer determined the rate and method of the employees' payment. The TAC alleges that "Eisenmann *by its contracts* with the Labor Contractor Defendants[4] [such as Vuzem] determined the rate of compensation." TAC at ¶ 140 (emphasis added). The TAC makes no allegation that Eisenmann determined the method of payment. The TAC alleges that Vuzem was the direct employer of Papes. *Id.* at ¶¶ 135-36.

Curiously, the TAC strategically deletes the SAC's allegations that Vuzem was responsible for paying workers. Specifically, the SAC alleged that Vuzem paid workers small cash per diems while the workers were in the United States. SAC at ¶ 14, 112. The SAC also alleged that "the workers received a monthly salary in most instances of 800 euros that was deposited directly in their bank account in their home country (expressly stated in the Potrdilo O Zaposlitvi (Certificate of Employment) dated 13.02.2013 signed by Direktor *Ivan Vuzem* as being E 783,66 gross pay)." *Id.* at ¶ 14 (emphasis added). Thus, the SAC indicated that *Vuzem*, not Eisenmann, deposited wages in the workers' bank accounts in the workers' home countries. The SAC's allegations that Vuzem was responsible for paying the workers indicated that Eisenmann did not control the rate and method of the workers' payment. The "court may also consider the prior allegations as part of its 'context-specific' inquiry based on its judicial experience and common sense to assess whether the Third Amended Complaint plausibly suggests an entitlement to relief, as required under *Iqbal*." *Cole v. Sunnyvale*, 2010 WL 532428, at *4 (N.D. Cal. Feb. 9, 2010).

By contrast to the SAC, the TAC's allegation that "Eisenmann by its contracts with the Labor Contractor Defendants [such as Vuzem] determined the rate of compensation" is vague and

---

[4] Plaintiffs name numerous parties as "Labor Contractor" Defendants, many of which have not appeared yet in the instant case. For instance, LB metal d.o.o, D2N Tehnologije d.o.o, REHAU, VV Mot, d.o.o,, Magna International, Inc., Magna Automotive Services GmbH, Magna, d.o.o., and We-Kr d.o.o. are all named as "Labor Contractor" Defendants. TAC at ¶ 84. For present purposes, it is sufficient to note that Vuzem is named as a Labor Contractor Defendant. *Id.*

Case No. 16-CV-01120-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

conclusory. TAC at ¶ 140. Again, the TAC lacks any allegation that Eisenmann determined the method of workers' payment. The TAC also does not explain how Eisenmann's contracts with Vuzem dictate the rate at which Vuzem pays Vuzem's workers. Under *Twombly* and *Iqbal*, the TAC does not sufficiently allege that Eisenmann determined the rate and method of the workers' payment.

Moreover, the TAC does not allege that Eisenmann, directly or indirectly, paid workers from Eisenmann's own funds or provided employment benefits. In *Singh v. 7-Eleven, Inc.*, the fact that a defendant "was not responsible for setting plaintiffs' wages, using its funds to pay plaintiffs, or providing any employment benefits" weighed against a finding of joint employment. 2007 WL 715488, at *6 (N.D. Cal. Mar. 8, 2007).

Furthermore, the TAC does not allege that Eisenmann had a contract with the workers or that the workers received a cut of the monies Eisenmann paid Vuzem. As stated earlier, the TAC does not allege how any of Eisenmann's payments to Vuzem pursuant to Eisenmann's contracts with Vuzem were distributed. Even if the workers received a cut of Eisenmann's payments to Vuzem, courts have held that such facts do not establish a joint employer relationship.

In *Johnson v. Serenity Transp., Inc.*, the defendant Serenity Transportation was a mortuary transport company that employed the plaintiffs. 141 F. Supp. 3d 974, 980 (N.D. Cal. 2015) ("*Serenity II*"). The *Serenity II* plaintiffs sued Serenity Transportation and its "customer defendants" for whom the mortuary services were provided. *Id.* The question before the *Serenity II* court was whether the customer defendants were the plaintiffs' joint employers. The *Serenity II* plaintiffs had a contract with Serenity Transportation, a contract that indicated that "drivers receive a percentage of the fees for services that the Customer Defendants pay." *Id.* at 992. However, despite the fact that there was a contractual relationship between the plaintiffs and Serenity Transportation that gave the plaintiffs a cut of the fees for the services that the customer defendants paid, that was not enough to show that the third *Bonnette* factor weighed in favor of joint employment. *Id.* at 993.

The TAC's allegations indicate that Eisenmann had even less control over worker

18

payments than the customer defendants in *Serenity II*. The TAC vaguely alleges that Eisenmann participated in the workers' compensation scheme via its contracts with Vuzem. However, the *Serenity II* plaintiffs actually received a cut of the fees the customer defendants paid to Serenity Transportation, a cut that was dictated by the contract between the *Serenity II* plaintiffs and Serenity Transportation. Thus, the *Serenity II* plaintiffs were contractually direct beneficiaries of a percentage of the customer defendants' payments. In contrast, the TAC only vaguely alleges that Eisenmann's contracts with Vuzem somehow dictate the rate of Vuzem's workers' payment. The TAC also makes no allegation that Eisenmann had any impact on the workers' method of payment.

The TAC's allegations do not sufficiently allege that Eisenmann determined the rate and method of the employees' payment. Therefore, the third *Bonnette* factor weighs against a finding that Eisenmann was a joint employer.

The fourth *Bonnette* factor is whether the alleged joint employer maintained employment records for the workers. The TAC alleges that "Eisenmann by its control of the job sites maintained records of the entry to the job sites and to the hours worked by each employee, which constituted the *time records* for the employed workers." TAC at ¶ 140 (emphasis added). Thus, the TAC alleges that Eisenmann had control of workers' timesheets. That is not enough for a finding that Eisenmann maintained employment records. For instance, the *Pfohl v. Farmers Ins. Grp.* court found that keeping timesheets and various invoices was insufficient to show that the alleged joint employer maintained employment records for workers. 2004 WL 554834, at *6 (C.D. Cal. Mar. 1, 2004). Moreover, the *Singh* court found that control over payroll functions, including "*keeping and generating time records*; . . . calculating, generating, and delivering the employees' paychecks; filing quarterly returns; and providing employees with annual W2's" were among "ministerial functions" that did not establish that an alleged joint employer maintained employment records for workers. 2007 WL 715488, at *6 (emphasis added). In coming to its conclusion, the *Singh* court considered the totality of the circumstances surrounding the purported joint employer who, like Eisenmann, lacked control over the workers' rate and method of payment

19

under the third *Bonnette* factor. *Id.* Thus, the *Singh* court concluded that "ministerial functions" did not actually demonstrate a joint employment relationship between the *Singh* plaintiffs and the purported joint employer because the purported joint employer lacked control over significant aspects of the workers' employment. *Id.* The fact that the purported joint employer in *Singh* kept and generated time records was a "mere convenience" for the *Singh* workers' actual employer. *Id.* Consequently, the fourth *Bonnette* factor weighs against a finding that Eisenmann was a joint employer.

In sum, 3 of the 4 *Bonnette* factors and the totality of the circumstances weigh against finding that Eisenmann was Papes' joint employer. The Court next turns to Tesla.

ii. *Bonnette* Factors as Applied to Tesla

The first *Bonnette* factor is whether the alleged joint employer has the power to hire and fire the purported employees. The TAC contains no allegations, and Plaintiffs point to none in their opposition, that Tesla had the power to hire and fire workers. Thus, the first *Bonnette* factor weighs against a finding that Tesla was a joint employer.

The second *Bonnette* factor is whether the alleged joint employer had control over the employees' work schedules or conditions. The TAC contains no allegations, and Plaintiffs point to none in their opposition, that Tesla had control over workers' work schedules or conditions. Therefore, the second *Bonnette* factor weighs against a finding that Tesla was a joint employer.

The third *Bonnette* factor is whether the alleged joint employer determined the rate and method of the employees' payment. Again, the TAC contains no allegations, and Plaintiffs point to none in their opposition, that Tesla determined the rate and method of workers' payment. Thus, the third *Bonnette* factor weighs against a finding that Tesla was a joint employer.

The fourth *Bonnette* factor is whether the alleged joint employer maintained employment records for the employees. The TAC alleges that "[t]he entry logs for the Tesla site were maintained by the security personnel of Tesla." *Id.* at ¶ 268. However, as the *Pfohl* court found, solely possessing timesheets and invoices counseled against a finding that an alleged joint employer maintained employment records. 2004 WL 554834, at *6. Likewise, the *Singh* court

20

United States District Court
Northern District of California

found that "keeping and generating time records," among other activities, was not sufficient to establish a joint employer relationship. 2007 WL 715488, at *6. Thus, the fourth *Bonnette* factor weighs against a finding that Tesla was a joint employer.

In sum, 4 of the 4 *Bonnette* factors and the totality of the circumstances weigh against a finding that Tesla was a joint employer.

### iii. Summary

In sum, the *Bonnette* factors counsel against a finding that either Eisenmann or Tesla was Papes' joint employer. Thus, Moving Defendants' motion to dismiss the FLSA claims (counts 2 and 3) is GRANTED.

The Court finds that granting leave to amend would be futile and unduly prejudicial to Moving Defendants. *Leadsinger, Inc.*, 512 F.3d at 532. Plaintiffs have already had 4 opportunities to clearly state and allege facts in support of their claims. Plaintiffs' latest attempt to do so totals 108 pages. From the motion to dismiss the SAC, Plaintiffs had notice of the argument that neither Tesla nor Eisenmann were Papes' joint employers under the FLSA. *See* ECF No. 219 at 29-30. Moreover, in its October 1, 2018 Order dismissing the FLSA claims against Eisenmann because the SAC failed to sufficiently allege that Eisenmann was Plaintiffs' joint employer, the Court warned that "failure to cure the deficiencies . . . will result in a dismissal with prejudice." ECF No. 255 at 32. Nonetheless, Plaintiffs failed to cure the deficiencies. Because any amendment would be futile, and it would be unduly prejudicial to Moving Defendants to litigate a third motion to dismiss regarding the same deficiencies, leave to amend is DENIED.

The Court now turns to Papes' wage and hour claims under the California Labor Code.

### 2. California Labor Code Claims (Counts 4 to 8)

In its October 1, 2018 Order, the Court granted the motion to dismiss the SAC's California Labor Code claims with leave to amend. ECF No. 255 at 21. Plaintiffs have now filed their *third* amended complaint, reasserting the California Labor Code claims against Moving Defendants. After reviewing Plaintiffs' TAC, the Court agrees with Moving Defendants that Plaintiffs' fourth attempt at stating a claim fails, especially because the motion to dismiss the SAC provided

United States District Court
Northern District of California

Plaintiffs notice that Plaintiffs had failed to allege that Moving Defendants were not Papes'

employers under California law. ECF No. 219 at 29-32.

Papes claims that Moving Defendants violated California labor laws by: failing to pay

minimum wage (count 4); failing to pay overtime wages (count 5); failing to provide rest periods

(count 6); failing to provide accurate wage statements (count 7); and failing to pay waiting time

penalties (count 8). Moving Defendants argue that Papes' claims against Moving Defendants

under the California Labor Code fail because Plaintiffs fail to allege facts establishing that either

Eisenmann or Tesla was Papes' employer under California law. The Court agrees with Moving

Defendants' argument.

To be liable for violations of the California Labor Code, a defendant must be the plaintiff's

employer. *See, e.g.*, *Martinez v. Combs*, 49 Cal. 4th 35, 49 (2010) (affirming the application of the

FLSA "economic reality" test, which requires an employer-employee relationship to exist for

liability to arise, to California law); *Luna v. Universal Studio City Prods. LLLP*, 2013 WL

12308198, at *3 (C.D. Cal. Aug. 27, 2013) ("Under California law, only an 'employer' is liable

for failing to provide an employee with meal or rest periods and failing to furnish accurate,

itemized wage statements. . . . Similarly, only an 'employee' may bring actions to recover for

unpaid overtime compensation and failure to pay minimum wages"); Cal. Lab. Code § 203

(requiring that an "employer" pay waiting time penalties).

California has adopted the California Industrial Welfare Commission's ("IWC") definition

of employer. *Martinez*, 49 Cal. 4th at 64. The IWC provides three alternative definitions of what it

means "to employ" someone: "(a) to exercise control over the wages, hours or working conditions,

*or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment

relationship." *Id.* The Court takes each IWC prong in turn.

        a. IWC Prong 1—Whether Moving Defendants Exercised Control over Papes'
            Wages, Hours, or Working Conditions

Under the first prong of the IWC's definition of employer, "an entity employs workers if it

'directly or indirectly, or through an agent or any other person, employs or exercises control' over

their wages, hours, or working conditions." *Ochoa v. McDonald's Corp.*, 133 F. Supp. 3d 1228, 1233 (N.D. Cal. 2015). However, the *Ochoa* court noted that "[w]hile this language is potentially quite broad in scope, California courts have circumscribed it by denying employer liability for entities that may be able to *influence* the treatment of employees but lack the authority to *directly control* their wages, hours or conditions." *Id.* (emphasis added).

As to Eisenmann, there is no indication that Eisenmann meets the IWC's first prong. The TAC alleges that "Eisenmann . . . had supervisors that came from time to time to take a look to see how the work performed by . . . Stjepan Papes . . . was progressing and to assess it. Further, Eisenmann . . . through multiple employees and agents provided instructions to . . . Papes." TAC at ¶ 140. However, in *Martinez*, the plaintiffs—seasonal agricultural workers—sued a farmer and two of the produce merchants through whom the farmer sold his strawberries. *Martinez*, 49 Cal. 4th at 42. *Martinez* recognized that the produce merchants could leverage their business relationship to influence the farmer, but determined that the merchants were not the workers' joint employers. *Id.* at 72, 74-75. The fact that a merchant's representatives would explain to the *Martinez* workers "how the merchant wanted strawberries packed," would "check the packed containers as workers brought them from the field," and "would also sometimes speak directly to the workers, pointing out mistakes in packing such as green and rotten berries" did not establish that the merchants were the workers' joint employers. *Id.* at 76. Here, the fact that Eisenmann's supervisors periodically checked Papes' work or gave Papes instructions—like how the *Martinez* merchants' representatives would check the workers' packed containers or give the workers' instructions in how the merchants wanted the strawberries picked—would not be enough under controlling California Supreme Court law in *Martinez* to establish that Eisenmann had control over Papes' hours or working conditions.

As for control over wages, the TAC alleges that "Eisenmann *by its contracts* with the Labor Contractor Defendants [such as Vuzem] determined the rate of compensation." *Id.* at ¶ 140 (emphasis added). Nonetheless, it was still Vuzem that directly employed and paid Papes. *Id.* at ¶¶ 135-36. As the *Ochoa* court held, merely being able to "influence the treatment of workers" is not

Case No. 16-CV-01120-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

enough to show that there was an employer-employee relationship. 133 F. Supp. 3d at 1233. Here, notably, the TAC does *not* allege that Eisenmann set the employees' rate of compensation. At most, Plaintiffs have alleged that Eisenmann had *influence* over the workers' wages through its contracts with the "Labor Contractor Defendants" like Vuzem.

Likewise, in *Martinez*, the produce merchants paid the farmer an advance, which could be an indirect way of controlling the farmer's ability to pay the workers. 49 Cal. 4th at 72. Nonetheless, that was not enough to show that the produce merchants actually controlled the workers' wages and were the workers' employers. *Id.* at 72, 74-75. Here, the relationship between Vuzem and Eisenmann is the same as the relationship between the *Martinez* farmer and produce merchants. Eisenmann may have exercised some level of attenuated control over Papes' salary through Eisenmann's contracts with Vuzem, much like the attenuated control the produce merchants had over the *Martinez* workers through payment of the advance, but it was Vuzem that ultimately paid Papes. TAC at ¶¶ 135-36.

In sum, Eisenmann does not meet the definition of an employer under the IWC's first prong.

As to Tesla, the TAC contains no allegations, and Plaintiffs point to none in their opposition, that Tesla controlled Papes' wages, hours, or working conditions. Thus, Tesla does not meet the definition of an employer under the IWC's first prong.

b. IWC Prong 2—Whether Moving Defendants Permitted Papes to Work

Under the IWC's second prong, "the basis of liability is the defendant's knowledge of and *failure to prevent* the work from occurring." *Martinez*, 49 Cal. 4th at 70 (emphasis in original); *see also Betancourt v. Advantage Human Resourcing, Inc.*, 2014 WL 4365074, at *5 (N.D. Cal. Sept. 3, 2014) ("The essence of this test is the idea that an employment relationship exists if an entity knows or should know that an individual is doing work, yet fails to prevent the individual from working."). "Merely receiving the benefit of the employees' work is not enough to establish liability" under California law. *Serenity II*, 141 F. Supp. 3d at 997 (internal quotation marks omitted).

24

As to Eisenmann, the TAC does not allege that Eisenmann had the power to hire and fire Papes. The most Plaintiffs can cite in their opposition are allegations that Eisenmann "contracted with other entities such as ISM Vuzem, d.o.o. to hire construction workers including Stjepan Papes." TAC at ¶ 79. The TAC makes clear that "Eisenmann . . . used a series of labor contractor entities, including ISM Vuzem d.o.o. . . . to act as subcontractors and to hire enough foreign workers to do the construction work." *Id.* at ¶ 84. Similarly, in *Martinez*, the California Supreme Court found that the IWC's second prong was not met because "neither [produce merchants] suffered or permitted plaintiffs to work because neither had the power to prevent plaintiffs from working. [The farmer] and his foremen had the exclusive power to hire and fire his workers . . . ." 49 Cal. 4th at 70. Thus, because Eisenmann is not alleged to have hiring and firing power over Papes, Eisenmann does not meet the definition of employer under the IWC's second prong.

As to Tesla, there are no allegations in the TAC, and Plaintiffs point to none in their opposition, that Tesla had hiring and firing power over Papes. Thus, under *Martinez*, Tesla does not meet the definition of employer under the IWC's second prong.

     c.   IWC Prong 3—Whether Moving Defendants had a Common Law Employment Relationship with Papes

Under the third prong of the IWC's employer test, an employer-employee relationship could exist if there was a common law employment relationship with the employee. "[T]he principal test of [a common law] employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 531 (2014). "[T]he strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because '[t]he power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities.'" *Id.* (quoting *Burlingham v. Gray*, 22 Cal. 2d 87, 100 (1943)).

As discussed above, neither Eisenmann nor Tesla are alleged to have possessed the power to hire and fire Papes. Thus, under *Ayala*, the "strongest evidence of the right to control" points away from an employer-employee relationship between the Moving Defendants and Papes. *Id.*

Case No. 16-CV-01120-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

Plaintiffs respond by citing Cal. Lab. Code § 2750.5, which states: "There is a rebuttable presumption affecting the burden of proof that a worker performing services for which a license is required pursuant to Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code, or who is performing such services for a person who is required to obtain such a license is an employee rather than an independent contractor." However, § 2750.5 is inapplicable to showing that Papes was an employee of the Moving Defendants. First, it is plain from the statutory text that the primary question sought to be resolved by § 2750.5 is whether a worker is an independent contractor or not, a question that is irrelevant to the instant case. Second, Plaintiffs do not question, and Moving Defendants do not deny, that Papes was an employee *of Vuzem*. TAC at ¶¶ 135-36. The statute does not resolve whether this means that Eisenmann, with whom Vuzem had a contractual relationship, or Tesla, are therefore also Papes' employers. After all, the *statute* does not answer the question of *who* is the employer.

The only cases this Court has found to create employment relationships under § 2750.5 have been between an *unlicensed* subcontractor and a general contractor: "Labor Code section 2750.5 operates to conclusively determine that a general contractor is the employer of not only its unlicensed subcontractors but also those employed by the unlicensed subcontractors." *See, e.g.*, *Hunt Building Corp. v. Bernick*, 79 Cal. App. 4th 213, 220 (2000). The TAC alleges that "VUZEM USA COMPANY" held a California contractor's license (license number 566486). TAC at ¶ 211. According to a search of the California Contractors State License Board website, an entity named "VUZEM USA COMPANY" was indeed a recipient of contractor's license number 566486 from May 1, 1989 to May 31, 2018.[5] Thus, Cal. Lab. Code § 2750.5 and related case law offer no help in identifying whether *Moving Defendants* are Papes' employers because Vuzem was not an *unlicensed* subcontractor. Vuzem was licensed from May 1, 1989 until May 31, 2018. Lesnik was Vuzem's worker in 2015 and Papes was Vuzem's worker from 2013 until 2016. TAC at ¶ 136. Thus, Vuzem employed Lesnik and Papes while Vuzem had an active contractor's

---

[5] "Undisputed matters of public record" are proper subjects for judicial notice. *Disabled Rights Action Comm.*, 375 F.3d at 866 n.1.

Case No. 16-CV-01120-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

license. Therefore, Cal. Lab. Code § 2750.5 is not applicable to the instant case.

d.   Summary

Plaintiffs have failed to establish under any of the 3 IWC prongs that the Moving Defendants were employers of Papes. Thus, Papes' California Labor Code causes of action fail. Therefore, Plaintiffs' claims that Moving Defendants violated California labor laws by: failing to pay minimum wage (count 4); failing to pay overtime wages (count 5); failing to provide rest periods (count 6); failing to provide accurate wage statements (count 7); and failing to pay waiting time penalties (count 8) are DISMISSED.

The Court finds that granting leave to amend would be futile and unduly prejudicial to Moving Defendants. *Leadsinger, Inc.*, 512 F.3d at 532. Plaintiffs have already had 4 opportunities to clearly state and allege facts in support of their claims. Plaintiffs' latest attempt to do so totals 108 pages. From the motion to dismiss the SAC, Plaintiffs had notice that Plaintiffs had failed to allege that Eisenmann and Tesla were Papes' employers under California law. *See* ECF No. 219 at 29-32. Moreover, the Court's October 1, 2018 Order held that Plaintiffs failed to state a cause of action under the California Labor Code. ECF No. 255 at 19-21. In the October 1, 2018 Order, the Court warned that "failure to cure the deficiencies . . . will result in a dismissal with prejudice." *Id.* at 32. Despite this warning, the TAC fails to cure the deficiencies previously identified in the motion to dismiss the SAC. Because any amendment would be futile, and it would be unduly prejudicial to Moving Defendants to litigate a third motion to dismiss regarding the same deficiencies, leave to amend is DENIED.

Next, the Court discusses Plaintiffs' human trafficking claims under federal and California law.

**C.  Human Trafficking Claims (Counts 9 to 12)**

Plaintiffs (specifically, Papes and Lesnik) also bring forced labor claims under the federal Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1589, *et seq.*, (counts 9 and 11) and the California Trafficking Victims Protection Act ("CTVPA"), Cal. Civil Code § 52.5, (counts 10 and 12).

27

Counts 9 and 11 are duplicative because count 9 is an individual claim for violations of the TVPRA, whereas count 11 was a class action claim for violations of the TVPRA. However, on December 17, 2018, Plaintiffs voluntarily dismissed count 11's class claims and are now only asserting an individual claim for violations of the TVPRA in count 11. ECF No. 312.

Counts 10 and 12 are also duplicative because count 10 is an individual claim for violations of the CTVPA, whereas count 12 was a class action claim for violations of the CTVPA. On December 17, 2018, Plaintiffs voluntarily dismissed count 12's class claims and are now only asserting an individual claim for violations of the CTVPA in count 12. ECF No. 313.

For the reasons below, the Court finds that Papes has stated a claim under the TVPRA and under California law. Lastly, the Court addresses the effect of Lesnik's June 2016 Alameda County Superior Court case settlement agreement on his human trafficking claims.

### 1. TVPRA Claims (Counts 9 and 11)

The TVPRA includes a civil cause of action under 18 U.S.C. § 1595 that allows victims to seek damages and attorneys' fees from the "perpetrator" of a violation of, *inter alia*, laws prohibiting trafficking and forced labor. § 1595(a) also extends liability beyond perpetrators to anyone who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known" committed a violation of applicable trafficking and forced labor laws. *See Shuvalova v. Cunningham*, 2010 WL 5387770, at *3 & n.3 (N.D. Cal. Dec. 22, 2010) (noting same). At the outset, the Court notes that Rule 9(b) does not apply to Plaintiffs' § 1595 claim because it does not sound in fraud. *See Aragon v. Che Ku*, 277 F. Supp. 3d 1055, 1061 n.2 (D. Minn. 2017) (rejecting this argument in case concerning § 1595).

The TAC alleges that Defendants violated 18 U.S.C. § 1589, and that this is the basis for Plaintiffs' TVPRA claim. *See* TAC at ¶ 341 (referring to forced labor violations under "§ 1589"). § 1589(a) prohibits obtaining labor or services in 4 ways:

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
(2) by means of serious harm or threats of serious harm to that person or another person;
(3) by means of the abuse or threatened abuse of law or legal process; or

28

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

18 U.S.C. § 1589(a)(1)-(4).

Moving Defendants move to dismiss Plaintiffs' TVPRA claim on 4 grounds. First, Moving Defendants note that the TAC contains no allegations that Plaintiffs were subjected to forced labor under § 1589(a)(1) or (4). Mot. at 14. Plaintiffs do not dispute this point, so the remaining analysis focuses on § 1589(a)(2) and (3). Second, Moving Defendants argue that Plaintiffs fail to state a claim under § 1589(a)(2) and (3). Third, Moving Defendants assert that Manufacturing Defendants—Mercedes-Benz, Deere, REHAU, LaX, VW, Discatal, Volvo, and BMW, Mot. at 2—did not knowingly benefit from any purported forced labor. Because Plaintiffs voluntarily dismissed Manufacturing Defendants with prejudice from this case on December 17, 2018, ECF Nos. 315-322, the Court need not address this argument. Fourth, Moving Defendants argue that the Court should not exercise pendant jurisdiction over Manufacturing Defendants. Again, as Plaintiffs voluntarily dismissed Manufacturing Defendants with prejudice from this case on December 17, 2018, the Court need not address this argument. Thus, the only remaining argument is ground 2: that Plaintiffs fail to state a claim under § 1589(a)(2) and (3).

      a. Whether Plaintiffs State a Claim under § 1589(a)(2) and (3)

§ 1589(c) defines the "serious harm" referenced in § 1589(a)(2) as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm," that is serious enough to compel a reasonable person to perform labor to avoid the harm. *See United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (noting statutory amendments in 2000 sought to broaden § 1589 to nonviolent conduct by, *inter alia*, defining serious harm broadly). § 1589(a)(3) prohibits obtaining labor or services "by means of the abuse of threatened abuse of law or legal process."

The TAC meets the bar for both §§ 1589(a)(2) and 1589(a)(3). Specifically, the TAC alleges that Vuzem threatened to withhold pay if workers became too sick to work or reported a job injury; Vuzem threatened to withhold medical benefits if workers reported a job injury; Vuzem

threatened to withhold visas and immigration status; Vuzem threatened to file a civil suit against Lesnik while he was hospitalized; and Vuzem even told Lesnik that "this will not go well for you." TAC at ¶¶ 117, 315, 324-26; *see Manzarek*, 519 F.3d at 1031 (noting courts accept "factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party").

Moreover, as to both §§ 1589(a)(2) and 1589(a)(3), "multiple jurisdictions have found that the threat of deportation may itself constitute a threat sufficient to satisfy the second and/or third element of [§ 1589] forced labor." *Echon v. Sackett*, 2017 WL 4181417, at *14 (D. Colo. Sept. 20, 2017), report and recommendation adopted, 2017 WL 5013116 (D. Colo. Nov. 1, 2017); *Nuñag–Tanedo v. E. Baton Rouge*, 790 F. Supp. 2d 1134, 1146 (C.D. Cal. 2011) (holding threat of deportation constitutes "abuse of legal process" within the meaning of § 1589 in case concerning H1–B visa holders); *Aguirre v. Best Care Agency*, 961 F. Supp. 2d 427, 444 (E.D.N.Y. 2013) (stating "[t]he threat of deportation alone may support a claim for forced labor" under § 1589). Here, Plaintiffs can point not only to immigration threats, but also to financial threats, threats of litigation, and threats to withhold medical care. Taken together, these allegations are sufficient to state a claim under § 1589. *See Aragon v. Che Ku*, 277 F. Supp. 3d 1055, 1070 (D. Minn. 2017) (denying motion to dismiss where some undocumented defendants were locked in freezers and others were simply threatened with deportation); *United States v. Dann*, 652 F.3d 1160, 1172 (9th Cir. 2011) (affirming § 1589 conviction where defendant threatened undocumented nanny with withholding back pay, false accusations of theft, immigration consequences, and the defendant's potential loss of child custody). Because Plaintiffs can state a claim under § 1589 against Vuzem, and Plaintiffs' TVPRA claim is based on a § 1589 claim, Plaintiffs can also state a TVPRA claim under § 1595(a) against Vuzem.

The Court now discusses Tesla and Eisenmann's roles and potential liability because the TVPRA also gives rise to liability to "[w]hoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means" proscribed under the 4 prongs of 18 U.S.C. § 1589(a),

30

which are discussed above. 18 U.S.C. § 1589(b). The Court will first address whether Tesla and Eisenmann financially benefitted from the human trafficking, and then will address whether they did so knowingly.

First, regarding any financial benefit, Tesla and Eisenmann, on June 6, 2014, entered into an agreement under which Eisenmann would establish a paint shop at Tesla's facility in Fremont, California. TAC at ¶ 213. On September 29, 2014, representatives for Vuzem, Eisenmann, and Tesla met and signed a subsequent agreement under which Eisenmann would employ Vuzem as a subcontractor to assist the construction of the paint shop. *Id.* Construed in Plaintiffs' favor, these allegations are sufficient to show that Eisenmann and Tesla benefitted "financially" or by "receiving anything of value" from participating in a venture that violated § 1589, because Vuzem's actions were committed to fulfill a contract signed with Tesla and Eisenmann.

Second, regarding knowledge, the TAC also adequately alleges that Eisenmann "knew or should have known" about Vuzem's treatment of its workers. *Id.* at ¶ 160. The TAC alleges, in detail, that Eisenmann submitted false letters to secure B-1 visas for Lesnik, Papes, and other workers. *Id.* at ¶ 87; *see* ECF No. 219-3 at 5, 7 (copies of the letters). The TAC further alleges that Vuzem was a subcontractor for Eisenmann, *id.* at ¶ 140, that Eisenmann, "directly employed field managers and project managers for the work sites," *id.*, and that Eisenmann supervisors "came from time to time to take a look to see how the work performed by Gregor Lesnik, Stjepan Papes and the other similarly situated alien 'B-1' workers was progressing." *Id.*; *see also id.* ("Eisenmann Corporation had all 'subcontractor' defendants come to its headquarters in Illinois for directions."). Given Eisenmann's direct involvement in every aspect of the events at issue, the Court finds that Eisenmann knew or should have known of Vuzem's treatment of its employees.

As for Tesla, per the TAC, Tesla knew Vuzem's workers were performing construction work prohibited by their B-1 visas and knew the workers lacked state licenses that are necessary to perform construction work. *Id.* at ¶ 139, 145, 211. Tesla also knew the workers' shifts were extreme because Tesla kept records of their entries and exits into its facility. *Id.* at ¶ 234. For example, the TAC alleges Lesnik and Papes typically worked 12 hours a day (and never less than

31

10), over 80 hours a week, over 250 hours a month, and received only 1 day in 14 off. *Id.* at ¶ 237. At the end of shifts, Vuzem's workers were put in company vans and driven to company accommodations. *Id.* at ¶ 234. Tesla was also involved to at least some degree in the work performed, as senior engineer Bobby Gonzales provided instructions to Lesnik, and Tesla maintained all job hazard forms at the Fremont facility. *Id.* at ¶ 145. As it must, the Court construes the TAC's allegations in Plaintiffs' favor. *Manzarek*, 519 F.3d at 1031. So construed, the Court finds that Tesla knew or should have known of Vuzem's mistreatment of the workers who spent every day at Tesla's facility.

The Court finds Moving Defendants' arguments that Papes "instead levels complaints that fall far short of 'serious harm'" unconvincing. Mot. at 14. Moving Defendants point to allegations that workers were provided with poor housing conditions or that they were not paid if they were sick as if they were the only allegations made in support of the TVPRA claim. However, as aforementioned, Papes alleges far more potentially-illegal conduct, such as threats to withhold visa and immigration status. TAC at ¶ 117. Also as discussed above, as to both §§ 1589(a)(2) and 1589(a)(3), "multiple jurisdictions have found that the threat of deportation may itself constitute a threat sufficient to satisfy the second and/or third element of [§ 1589] forced labor." *Echon*, 2017 WL 4181417, at *14, report and recommendation adopted, 2017 WL 5013116.

In sum, there are sufficient allegations as to render both Eisenmann and Tesla liable pursuant to § 1595(a). Thus, Moving Defendants' motion to dismiss is DENIED as to count 9 (individual violations of TVPRA).

As aforementioned, Plaintiffs voluntarily dismissed count 11's class claims and are now only asserting an individual claim for violations of the TVPRA in count 11. ECF No. 312. "It is well established that a district court has broad discretion to control its own docket, and that includes the power to dismiss duplicative claims." *M.M. v. Lafayette School Dist.*, 681 F.3d 1082, 1091 (9th Cir. 2012). Now that counts 9 and 11 are duplicative because they both state an individual claim for violations of the TVPRA, the Court DISMISSES count 11.

## 2. CTVPA Claims (Counts 10 and 12)

United States District Court
Northern District of California

Plaintiffs' California Trafficking Victims Protection Act ("CTVPA") claim is based on Cal. Civil Code § 52.5, which allows victims to seek damages for violations of Cal. Penal Code § 236.1, which defines trafficking and forced labor crimes. This Court has held that the "California statutes at issue [in the instant case] mirror the TVPRA." ECF No. 255 at 26; *Lesnik v. Eisenmann SE*, 2018 WL 4700342, at *15 (N.D. Cal. Oct. 1, 2018). Moving Defendants agree that "California law does not offer additional grounds for liability" from the TVPRA, and Plaintiffs do not dispute this fact. Mot. at 23 n.20. Thus, in turn, the Cal. Civil Code § 52.5 claim survives as to Eisenmann and Tesla because Moving Defendants concede—and Plaintiffs do not dispute—that the CTVPA does not provide a separate basis for liability from the TVPRA. Opp. at 20. Thus, because Plaintiffs' TVPRA claim survives as to Eisenmann and Tesla, Plaintiffs' CTVPA claim does as well. Therefore, Moving Defendants' motion to dismiss is DENIED as to count 10 (individual violations of the CTVPA).

As aforementioned, Plaintiffs voluntarily dismissed count 12's class claims and are now only asserting an individual claim for violations of the CTVPA in count 12. ECF No. 313. The Court has the power to dismiss duplicative claims. *M.M.*, 681 F.3d at 1091. Now that counts 10 and 12 are duplicative because they both state an individual claim for violations of the CTVPA, the Court DISMISSES count 12.

### 3. The Effect of Lesnik's June 2016 Settlement Agreement

Moving Defendants argue that Lesnik's June 2016 settlement agreement bars all of Lesnik's non-FCA claims in the instant action (i.e., federal and state human trafficking claims) because the settlement agreement broadly releases all claims or potential claims arising out of his Alameda County Superior Court action. Mot. at 21. Plaintiffs argue that Lesnik's settlement bars only claims relating to the fall Lesnik suffered while working at Tesla. Opp. at 31. The Court agrees with Moving Defendants.

"California has a strong policy in favor of enforcing settlement agreements." *Carcamo v. Vacation Interval Realty Inc.*, 2014 WL 12576802, at *2 (C.D. Cal. Aug. 19, 2014) (citing *Osumi v. Sutton*, 151 Cal. App. 4th 1355, 1357 (2007)).

33

Lesnik's settlement agreement released:

> [A]ll claims, demands, action, or causes of action, known or unknown, including all injuries, damages, or death, arising out of or in any way connected to or resulting from the claims and allegations made, or which could have been made in the [Alameda County Superior Court action and workers' compensation action] as referred to in Paragraph 3 above, including the full and complete discharge from and waiver of any potential and future wrongful death claim arising out of or in any way connected to or resulting from GREGOR LESNIK'S alleged injuries and damages as a result of the accident.

ECF No. 300-3, Ex. A at 3. The settlement agreement also released "all wage and hour *and employment-related claims*." *Id.* at 4 (emphasis added).

"A clause providing for the release of claims may refer to all claims raised in the pending action, *or* it may refer to all claims, both potential and actual, that may have been raised in the pending action with respect to the matter of controversy." *Villacres v. ABM Indus. Inc.*, 189 Cal. App. 4th 562, 586 (2010) (internal quotation marks omitted). "The weight of authority establishes that . . . a court may release not only those claims alleged in the complaint and before the court, but also claims which *could have been alleged* by reason of or in connection with any matter or fact set forth or referred to in the complaint. . . ." *Id.* According to the California Supreme Court, "the release of 'all claims and causes of action' must be given a comprehensive scope." *Jefferson v. Dep't of Youth Auth.*, 28 Cal. 4th 299, 306 (2002).

Here, Plaintiffs are incorrect in their interpretation of the release as only being limited to Lesnik's injuries and damages as a result of his accident. The release clearly releases "all claims . . . or causes of action, arising out of or in any way connected to or resulting from the claims and allegations made, or which could have been made in the" Alameda County Superior Court action, "*including* the full and complete discharge from and waiver of any potential and future wrongful death claim . . . connected to . . . GREGOR LESNIK'S alleged injuries and damages as a result of the accident." ECF No. 300-3, Ex. A at 3 (emphasis added). The release is unambiguous. The word "including" in the release *does not* mean "limited to." The release clearly releases claims that were made or could have been made in the Alameda County Superior Court action, *including* that of a future wrongful death claim connected to Lesnik's accident.

34

Moreover, the settled claims included more than simply personal injury claims. Lesnik's second amended complaint in the Superior Court action also alleged multiple violations of the California Labor Code, such as under Cal. Lab. Code § 1182.12 (failing to pay minimum wage), Cal. Lab. Code § 226.7 (failure to provide meal breaks), and Cal. Lab. Code § 510 (failure to pay overtime wages). ECF No. 130, Ex. C at ¶ 102, 115, 118.

The question now becomes whether Lesnik could have made his human trafficking claims in the Alameda County Superior Court action. The Court finds that Lesnik could have made both his federal and state-based human trafficking claims in the Superior Court action. In Lesnik's second amended complaint in the Superior Court action, Lesnik specifically mentions "the false statements to the United States Embassy concerning visas, the gross and unconscionable underpayment of wages, the lack of workers compensation insurance, and the indentured servitude nature of the 'employment' relationship with Plaintiff Gregor Lesnik and workers similarly situated to Gregor Lesnik." ECF No. 130, Ex. C at ¶ 167. The Superior Court complaint, like the TAC, mentioned threats against Lesnik, i.e., comments by Robert Vuzem that "things would not go well for him." *Id.* at ¶ 164. Moreover, the Superior Court complaint, like the TAC, mentioned issues with Lesnik's return flight to Slovenia. *See id.* at ¶ 122 ("Defendant ISM Vuzem d.o.o. and defendant Eisenmann Corporation promised to pay Gregor Lesnik for transportation and for housing. Each have failed and refused to pay Gregor Lesnik his expenses for [his] return flight to Slovenia."). Lesnik also fully alleged the details of the agreement between Eisenmann and Tesla for Tesla to provide automotive paint equipment for the Tesla plant in Fremont, California. *Id.* at ¶ 38-43. Notably, Vuzem, Eisenmann, and Tesla were all defendants in the Superior Court action. *Id.* at ¶¶ 2-11, 14-18.

In sum, Lesnik basically alleged in his Superior Court action aspects of a federal and state cause of action for human trafficking. The Superior Court complaint shows that at the time Lesnik filed his Superior Court action, with the assistance of the same counsel as in the instant case, facts relating to the human trafficking claims were fully developed in a way that they "*could have been alleged* by reason of or in connection with any matter or fact set forth or referred to in the

35

complaint." *Villacres*, 189 Cal. App. 4th at 586. Thus, the factual predicate to Lesnik's human trafficking claims in the instant case are the same as those Lesnik alleged in the Superior Court action, as both actions include employment-based allegations made against Eisenmann, Tesla, and Vuzem. Therefore, Lesnik's human trafficking claims are barred because the settlement agreement released "all wage and hour *and employment-related claims*," and Lesnik's human trafficking claims are employment-related as shown by Lesnik's allegations. ECF No. 300-3, Ex. A at 4.

The situation here is analogous to that in *Villacres*. The *Villacres* court was considering the application of a blanket release made in a settlement agreement with verbiage similar to Lesnik's release. 189 Cal. App. 4th at 572 ("[*T*]*he settlement class and each of the Class Members hereby . . . waive, fully release and forever discharge the Releasees from* any and all claims, debts, liabilities, demands, obligations, . . . damages, action or causes of action of any kind, whether known or unknown, which have been or could have been asserted against the Releasees . . . ." (emphasis in original).). The *Villacres* settlement agreement settled claims that a defendant had failed to pay its employees overtime compensation and had violated the Unfair Competition Law. *Id.* at 570. The *Villacres* plaintiff then brought a separate action for civil penalties under the Private Attorneys General Act ("PAGA") for other violations of the California Labor Code not previously alleged, such as a failure to pay overtime, failure to provide complete wage statements, failure to provide meal and rest periods, failing to pay wages on a timely basis, and failure to indemnify employees for business expenses and losses. *Id.* at 574. The *Villacres* plaintiff argued that the PAGA claims were not barred because "[c]ompensation for a Labor Code violation serves the private interest of the aggrieved employee, but a penalty under the PAGA serves a public interest similar to that of law enforcement statutes," therefore "the recovery of *unpaid wages* for the violation of a Labor Code provision does not involve the same primary right as the recovery of a *civil penalty* under the PAGA for the same violation." *Id.* at 581. Nonetheless, because the *Villacres* settlement agreement contained a blanket release provision, the court found the *Villacres* plaintiff's PAGA action was barred because the term "all claims" in the settlement agreement" included "claims that are not expressly enumerated in the release." *Id.* at 418 (quoting *Jefferson*,

Here, there is a similarly-broad release provision that released claims not expressly brought in Lesnik's action. Moreover, it is noteworthy that Lesnik filed the instant action on March 7, 2016, 3 months *before* he entered into the June 2016 settlement agreement.[6] *See* ECF No. 1 (March 7, 2016 complaint). Thus, Lesnik knew of all the facts that would give rise to his human trafficking claims before he entered into the settlement agreement.

Plaintiffs assert that Lesnik read the settlement as "being a settlement of the personal injury claims . . . and of a California wages claim," and thus Lesnik's understanding controls the interpretation of the settlement agreement. Opp. at 33. However, Lesnik's understanding of the settlement is counter to California law. "A settlement agreement is in the nature of a contract and is therefore governed by the same legal principles applicable to contracts generally." *Timney v. Lin*, 106 Cal. App. 4th 1121, 1127 (2003) (internal quotation marks omitted). "California recognizes the objective theory of contracts, under which [i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation." *In re Marriage of Simundza*, 121 Cal. App. 4th 1513, 1518 (2004). Thus, Lesnik's subjective intent is irrelevant here.

Because Lesnik was represented by the same counsel as the instant action; because Lesnik's Superior Court complaint alleged the same factual predicates as his human trafficking claims in the instant case; because Lesnik filed the instant action 3 months before his June 2016 settlement agreement; and because Lesnik had the opportunity to bring his employment-based human trafficking claims as part of his employment law-based lawsuit in Alameda County Superior Court but failed to, the Court finds that Lesnik's Superior Court settlement agreement bars Lesnik's human trafficking claims.

### 4. Summary

---

[6] Plaintiffs' complaints in the instant case were under seal from March 7, 2016 through April 25, 2017. ECF No. 26. Thus, Tesla, Eisenmann, and Vuzem were unaware of Plaintiffs' complaints in the instant case when Tesla, Eisenmann, and Vuzem decided to settle Lesnik's Superior Court and workers' compensation cases.

The Court DENIES Moving Defendants' motion to dismiss the federal TVPRA claims (count 9) and California CTVPA claims (count 10) as to Plaintiff Papes.

The Court GRANTS Moving Defendants' motion to dismiss the federal TVPRA claims (count 9) and California CTVPA claims (count 10) as to Plaintiff Lesnik. Because Lesnik's human trafficking claims are barred by the release in his June 2016 settlement agreement, further amendment of the human trafficking claims would be futile. Moreover, it would be unduly prejudicial to Moving Defendants to have to continue to litigate released claims. Therefore, leave to amend is denied. *Leadsinger, Inc.*, 512 F.3d at 532.

Moreover, the Court DISMISSES counts 11 (individual violations of the TVPRA) and 12 (individual violations of the CTVPA) as duplicative of counts 9 and 10, respectively.

**D. RICO Claims (Count 13)**

In its October 1, 2018 Order, the Court granted the motion to dismiss the SAC's Racketeer Influenced and Corrupt Organizations Act ("RICO") claims with leave to amend. ECF No. 255 at 31. Plaintiffs have now filed their *third* amended complaint, reasserting the RICO claims against Eisenmann. After reviewing Plaintiffs' TAC, the Court agrees with Moving Defendants that Plaintiffs' fourth attempt at stating a claim fails to address the deficiencies identified by the Court in the October 1, 2018 Order.

In particular, in dismissing Plaintiffs' RICO claims against Eisenmann in the October 1, 2018 Order, the Court explained that "the threadbare allegations in the SAC" fail to allege a RICO enterprise. *Id.* at 30. The Court warned that "failure to cure the deficiencies . . . will result in a dismissal with prejudice of the deficient claims or theories." *Id.* at 32.

Plaintiffs again bring claims under 18 U.S.C. § 1962(c) and (d) of the RICO Act. To successfully plead a RICO claim under § 1962(c), "Plaintiffs must plausibly allege that Defendants participated, directly or indirectly, in (1) the conduct (2) of an enterprise that affects interstate commerce, (3) through a pattern (4) of racketeering activity." *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 957 (N.D. Cal. 2018). Plaintiffs also must satisfy "RICO's statutory standing requirements, which require Plaintiffs to

38

plausibly allege (1) an injury to 'business or property,' that is (2) 'by reason of a violation of section 1962.'" *Id.* (quoting § 1964(c)).

Plaintiffs also proceed under § 1962(d), which provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." In considering Plaintiffs' RICO claims, the Court is mindful that "RICO is to be read broadly" and should "be liberally construed to effectuate its remedial purposes." *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (en banc) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98 (1985)).

Moving Defendants move to dismiss Plaintiffs' RICO claims against Eisenmann on 4 grounds. First, Moving Defendants argue that Plaintiffs have failed to allege any predicate acts of racketeering. This Court's October 1, 2018 Order held that Plaintiffs' human trafficking claims could serve as a RICO predicate. ECF No. 255 at 28 n.10; *Lesnik*, 2018 WL 4700342, at *16 n.10. Because Plaintiffs' human trafficking claims survive as to Papes, the human trafficking claims still provide a sufficient RICO predicate, and thus the Court need not further discuss Moving Defendants' first argument. Second, Moving Defendants argue that Plaintiffs have not alleged the existence of an enterprise. Third, Moving Defendants assert that Eisenmann is not the proximate cause of Plaintiffs' injury. Fourth, Moving Defendants believe that Lesnik's June 2016 settlement agreement bars his RICO claims. The Court finds Moving Defendants' second argument dispositive, and does not address the remaining arguments.

A RICO "enterprise" consists of "any individual, partnership, corporation, association, or other legal entity, or any union or group of individuals associated in fact although not as a legal entity." 18 U.S.C. § 1961(4). Plaintiffs here allege that all Defendants named in the TAC are an associated-in-fact enterprise, which is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015) (quoting *Odom*, 486 F.3d at 548). This sort of enterprise has "(A) a common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the purpose." *Chrysler*, 295 F. Supp. 3d at 957. The Ninth Circuit has clarified that "an associated-in-fact enterprise under

39

RICO does not require any particular organizational structure, separate or otherwise." *Odom*, 486 F.3d at 551

The Court finds that Plaintiffs have not adequately alleged the existence of an enterprise. Plaintiffs allege dozens of Defendants scattered across the United States and Europe constitute an enterprise. *See, e.g.*, TAC at ¶¶ 388 ("This RICO cause of action is based on an association in fact Enterprise consisting of the Eisenmann entities and the Labor Contractor defendants[7] and *other labor contractors not named in this complaint*" (emphasis and footnote added).); *id.* at ¶ 398 ("The Eisenmann entities, the Labor Contractor Defendants and the other labor contractors agreed to and did conduct and participate in the Enterprise."). However, Plaintiffs provide no allegations indicating that Defendants were engaged in anything more than routine business transactions. For instance, the TAC alleges that Eisenmann "used a series of labor contractor entities . . . to act as subcontractors and to hire enough foreign workers to do the construction work for the purpose of providing foreign nationals to fulfill labor leasing contracts." *Id.* at ¶ 84. Courts have "overwhelmingly rejected attempts to characterize routine commercial relationships as RICO enterprises." *Shaw v. Nissan N.A. Am., Inc.*, 220 F. Supp. 3d 1046, 1054 (C.D. Cal. 2016).

The international enterprise alleged in the TAC radiates outwards from Eisenmann and its customers (*e.g.* Tesla) and around 18 subcontractors (*e.g.* Vuzem) named in the TAC, as well as "other labor contractors" not named in the TAC. TAC at ¶¶ 84, 400. Indeed, Plaintiffs cite no case that has found a RICO enterprise based on a structure as loosely-defined as the one Plaintiff alleges here. Specifically, the TAC makes no attempt to describe Defendants' roles in the enterprise's structure, or to in any way differentiate among Defendants. Instead, the TAC baldly states an enterprise exists and that it consisted of a mixture of Defendants not separately identified. *Id.* at ¶ 400 ("Eisenmann entities, the Labor Contractor Defendants and other labor contractors

---

[7] Plaintiffs name numerous parties as "Labor Contractor" Defendants, many of which have not appeared yet in the instant case. For instance, LB metal d.o.o, D2N Tehnologije d.o.o, REHAU, VV Mot, d.o.o,, Magna International, Inc., Magna Automotive Services GmbH, Magna, d.o.o., and We-Kr d.o.o. are all named as "Labor Contractor" Defendants. TAC at ¶ 84. For present purposes, it is enough to note that Vuzem is named as a Labor Contractor Defendant. *Id.*

Case No. 16-CV-01120-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c), and conspired to violate the provisions of subsection (c), in violation of 18 U.S.C. § 1962(d)"). Courts have dismissed RICO claims based on such vague boilerplate, and this Court will do so as well. *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 2010 WL 384736, at *3 (N.D. Cal. Jan. 29, 2010) (dismissing complaint which relied on "conclusory boilerplate RICO allegations, with little factual specificity to establish the RICO enterprise, or each defendant's conduct in relation to the enterprise"); *see also Hill v. Opus Corp.*, 841 F. Supp. 2d 1070, 1102 (C.D. Cal. 2011) (dismissing because "plaintiffs use collective pleading to allege RICO 'conduct' or 'participation,' making repeated references to an unspecified 'defendant' or 'defendants' who committed the various acts in question."); *Kennedy v. Full Tilt Poker*, 2010 WL 1710006, at *6-8 (C.D. Cal. Apr. 26, 2010) (dismissing for failure to plead RICO enterprise with specificity).

By contrast, in a case where the Ninth Circuit found the existence of a RICO enterprise, each alleged participant of the enterprise was separately-named and the alleged racketeering activity committed by each alleged participant of the enterprise was set forth in detail. *Schreiber Distributing Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1395, 1398 (9th Cir. 1986); *see also Cunningham v. Offshore Specialty Fabrications, Inc.*, 543 F. Supp. 2d 614, 633–34 (E.D. Tex. 2008), *aff'd sub nom. Brown v. Offshore Specialty Fabricators, Inc.*, 663 F.3d 759 (5th Cir. 2011) (finding RICO enterprise adequately alleged where complaint alleged separate RICO enterprises based on each customer defendant's relationship with contractor defendants).

Thus, the Court must dismiss Plaintiffs' § 1962(c) cause of action because the existence of an enterprise is an essential element of the claim. *Chrysler*, 295 F. Supp. 3d at 9547. It follows that Plaintiffs' § 1962(d) must also be dismissed because the Ninth Circuit has held that "the failure to adequately plead a substantive violation of RICO precludes a claim for conspiracy" under § 1962(d). *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000); *Stitt v. Citibank, N.A.*, 2015 WL 75237, at *6 (N.D. Cal. Jan. 6, 2015), *aff'd*, 2018 WL 4090104 (9th Cir. Aug. 28, 2018) ("Accordingly, because plaintiffs have again failed to allege the requisite substantive elements of

RICO under Section 1962(c), their claim for conspiracy under Section 1962(d) also fails.").

In sum, the Court GRANTS Moving Defendants' motion to dismiss Plaintiffs' claim under § 1962(c) and (d) against Eisenmann.

The Court finds that granting leave to amend would be futile and unduly prejudicial to Moving Defendants. *Leadsinger, Inc.*, 512 F.3d at 532. Plaintiffs have already had 4 opportunities to clearly state and allege facts in support of their RICO claims. Plaintiffs' latest attempt to do so totals 108 pages. Moreover, in its October 1, 2018 Order dismissing the RICO claims because the SAC failed to sufficiently allege a RICO enterprise, the Court warned that "failure to cure the deficiencies . . . will result in a dismissal with prejudice." ECF No. 255 at 32. Nonetheless, Plaintiffs still failed to cure the deficiencies. Because any amendment would be futile, and it would be unduly prejudicial to Moving Defendants to litigate a third motion to dismiss regarding the same deficiencies, leave to amend is DENIED.

## IV.    CONCLUSION

10 Defendants—Eisenmann, Tesla, Mercedes-Benz, Deere, REHAU, LaX, VW, Discatal, Volvo, and BMW—filed the instant motion to dismiss. 3 days before Plaintiffs filed their opposition, Plaintiffs dismissed with prejudice all claims against 8 of the 10 Defendants— Mercedes-Benz, Deere, REHAU, LaX, VW, Discatal, Volvo, and BMW. ECF Nos. 315-22. Thus, the 2 Moving Defendants remaining are Eisenmann and Tesla.

For the foregoing reasons, Moving Defendants' motion to dismiss is GRANTED in part and DENIED in part. In particular:

1.    Moving Defendants' motion to dismiss Plaintiffs' False Claims Act claims (count 1) is GRANTED with prejudice.

2.    Moving Defendants' motion to dismiss Plaintiff Papes' Fair Labor Standards Act claims (counts 2 and 3) is GRANTED with prejudice.

3.    Moving Defendants' motion to dismiss Plaintiff Papes' California Labor Code claims for failing to pay minimum wage (count 4); failing to pay overtime wages (count 5); failing to provide rest periods (count 6); failing to provide accurate wage statements (count 7); and failing

42

to pay waiting time penalties (count 8) is GRANTED with prejudice.

      4.      Moving Defendants' motion to dismiss Plaintiffs' Trafficking Victims Protection Reauthorization Act (count 9) is GRANTED with prejudice with respect to Plaintiff Lesnik. Otherwise, Moving Defendants' motion to dismiss Plaintiffs' Trafficking Victims Protection Reauthorization Act (count 9) is DENIED with respect to Plaintiff Papes.

      5.      Moving Defendants' motion to dismiss Plaintiffs' California Trafficking Victims Protection Act (count 10) is GRANTED with prejudice with respect to Plaintiff Lesnik. Otherwise, Moving Defendants' motion to dismiss Plaintiffs' California Trafficking Victims Protection Act (count 10) is DENIED with respect to Plaintiff Papes.

      6.      Counts 11 (individual Trafficking Victims Protection Reauthorization Act claims) and 12 (individual California Trafficking Victims Protection Act claims) are DISMISSED as being duplicative of counts 9 and 10, respectively.

      7.      Moving Defendants' motion to dismiss Plaintiffs' Racketeer Influenced and Corrupt Organizations Act claims against Eisenmann (count 13) is GRANTED with prejudice.

      Accordingly, as a result of all these rulings, the only claims that remain against Eisenmann and Tesla are Papes' claims under the federal Trafficking Victims Protection Reauthorization Act (count 9) and California Trafficking Victims Protection Act (count 10).

**IT IS SO ORDERED.**

Dated: March 20, 2019

*Lucy H. Koh*
_____
LUCY H. KOH
United States District Judge